**BIOCRAFT LABORATORIES, INC., Appellant,**

v.

**U.S. INTERNATIONAL TRADE COMMISSION, Appellee.**

**Nos. 91–1153, 91–1208.**

United States Court of Appeals, Federal Circuit.

Oct. 17, 1991.

Marc S. Gross, Bryan, Cave, McPheeters & McRoberts, New York City, argued for appellant. With him on the brief were Michael G. Biggers, Elizabeth C. Carver, David A. Roodman and Elizabeth M. Garnhard.

Marc A. Bernstein, Office of the Gen. Counsel, U.S. Intern. Trade Com'n, Washington, D.C., argued for appellee. With him on the brief were Lyn Schlitt, Gen. Counsel and James A. Toupin, Asst. Gen. Counsel.

Before NEWMAN, Circuit Judge, SKELTON, Senior Circuit Judge, and LOURIE, Circuit Judge.

LOURIE, Circuit Judge.

This is a consolidated appeal from (1) an order of the United States International Trade Commission issued November 14, 1990, in *Crystalline Cefadroxil Monohydrate*, Inv. No. 337–TA–293, No. 91–1153, denying in part Biocraft Laboratories, Inc.'s request for return or cancellation of two bonds and (2) an order of the Commission issued January 11, 1991, Inv. No. 337–TA–293, No. 91–1208, denying Biocraft's request for reconsideration of the prior order. Because we conclude that the Commission's denial of Biocraft's requests was an abuse of discretion, we *reverse*.

## BACKGROUND

This appeal stems from an investigation begun by the Commission in response to a complaint and motion for temporary relief filed by the Bristol–Myers Company[1] on February 1, 1989. In the complaint, Bristol alleged that Biocraft, among other firms,

was violating section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, by importing and selling crystalline cefadroxil monohydrate (cefadroxil), an antibiotic covered by Bristol's U.S. Patent 4,504,657 ("the '657 patent"). Biocraft was named one of the respondents in the Commission's investigation. After an initial determination denying Bristol's motion for temporary relief on May 13, 1989, and a subsequent refusal to modify or vacate the initial determination, this court determined that the validity of the '657 patent was likely to be sustained and reversed the Commission's determination. *Bristol–Myers Co. v. United States Int'l Trade Comm'n*, 892 F.2d 1050, 15 USPQ2d 1258 (Fed.Cir.1989) (the Commission exceeded its discretionary authority, committed an error of law, and seriously misjudged the evidence by refusing to grant temporary relief under 19 U.S.C. § 1337(e)(3) where there was reason to believe that there was a violation of section 337).

On January 10, 1990, the Commission issued a temporary cease and desist order against Biocraft. Paragraph III of the Order listed the conduct prohibited by Biocraft, stating that

> Respondent shall not market, distribute, offer for sale, sell, or otherwise transfer in the United States imported crystalline cefadroxil monohydrate that infringes claim 1 of U.S. Letters Patent 4,504,657, except under license of the patent owner.

The Order required that Biocraft post a bond with the Commission to allow the sale of previously imported cefadroxil. Specifically, Paragraph XI of the Order stated:

> With respect to crystalline cefadroxil monohydrate imported prior to January 10, 1990, the conduct prohibited by paragraph III of this Order may be continued during the period in which this order is in effect subject to Respondent posting a bond in the amount of sixty-eight (68) percent of the entered value of crystalline cefadroxil monohydrate capsules or bulk powder in question. *This bond provision does not apply to conduct which*

1. The Bristol–Myers Company has since become    the Bristol–Myers Squibb Company.

*is otherwise permitted by paragraph IV of this Order.*

(Emphasis added). Paragraph XI further stated the conditions for forfeiture or release of the bond.[2] The conduct specifically allowed by Biocraft is recited in Paragraph IV, which provides that

[n]otwithstanding any other provisions of this Order, specific conduct otherwise prohibited by the terms of this Order, shall be permitted if, in a written instrument, such specific conduct *is licensed or authorized* by Complainant or related to the importation or sale of crystalline cefadroxil monohydrate thereof by or for the United States.

(Emphasis added). Biocraft did not appeal this order, but pursuant thereto, posted two bonds with the Commission, on January 19 and January 25, 1990, totalling $705,000.

The Commission concluded its section 337 investigation on March 15, 1990, issuing a permanent cease and desist order against Biocraft and determining that the '657 patent was valid and enforceable and had been infringed. Biocraft did not appeal this decision. The permanent relief order became final on May 14, 1990, at the end of the 60-day period in which the President could have disapproved the Commission's order.[3]

On March 29, 1990, Bristol and Biocraft settled their separate district court litigation concerning validity and infringement of the '657 patent. The settlement agreement required Biocraft to pay Bristol $21,-000,000. Additionally, the agreement provided that

Bristol-Myers will, if requested by Biocraft, join in any petition by Biocraft to obtain a return or discharge of the bond posted by Biocraft with the ITC, and Bristol-Myers will state that it is joining in and/or supporting such request as a result of a settlement with Biocraft.

Subsequently, on April 23, 1990, Biocraft requested that the Commission return the bonds. Pursuant to the settlement agreement, Bristol submitted a letter joining Biocraft's petition. The Commission investigative attorney opposed the petition.

On November 14, 1990, the Commission granted Biocraft's request in part, cancelling the portion of the bonds in excess of the amount which Biocraft was required to post,[4] and cancelling the portion posted for cefadroxil which was repurchased from some of Biocraft's customers and later transferred to Bristol under the settlement agreement. On December 6, 1990, Biocraft filed a petition for reconsideration in response to the November 14 order.[5] The Commission denied the petition and Biocraft appealed. At stake is $281,507, the amount of the bonds on which the Commission is demanding payment.

## DISCUSSION

■ The issue before us is whether the Commission's determination to deny Biocraft's request to release all of its bonds was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

2. The bond is to be forfeited in the event that the President approves, or does not disapprove within the Presidential review period, the Commission's Orders of January 10, 1990, or any subsequent final order issued after the completion of Investigation No. 337–TA–293, unless the U.S. Court of Appeals for the Federal Circuit, in a final judgment, reverses any Commission final determination and order as to Respondent on appeal, or unless Respondent exports the products subject to this bond or destroys them and provides certification to that effect satisfactory to the Commission.
   This bond is to be released in the event the President disapproves this Order and no subsequent order is issued by the Commission and approved, or not disapproved, by the President, upon service on Respondent of an Order issued by the Commission based upon application therefor made by Respondent to the Commission.

3. *See* 19 U.S.C. § 1337(j)(3).

4. In the *Commission Order and Opinion of November 14, 1990,* the Commission found that Biocraft had posted bond for some noninfringing cefadroxil sales for which Biocraft was not required to post a bond.

5. Additionally, Biocraft requested that the Commission recalculate the amount of the bond. The Commission's recalculations are not in issue.

Biocraft argues that its sales during the effective period of the Temporary Cease and Desist Order were authorized by Bristol and thus permitted by Paragraph IV and exempt from bonding by Paragraph XI of the Order. More specifically, Biocraft states that its settlement agreement constituted the authorization, making the bonding requirement of Paragraph XI inapplicable. Biocraft also argues that pursuant to 19 C.F.R. § 210.58(a)(3), the purpose of a respondent's bond in a temporary relief order is to protect the complainant, and the complainant here agreed to the Commission's release of the bonds.

The Commission, on the other hand, argues that prior or contemporaneous authorization by Bristol was required by the language of the Order in Paragraph IV, whereas these sales were not previously authorized, the settlement between Biocraft and Bristol occurring after the sales. The Commission further argues that the legislative history of the Trade Act of 1974, the operation of the bonding requirement, and the purpose of section 337 proceedings support its position. According to the Commission, the legislative history of the bonding requirement never mentions the interest of the complainant, but rather refers to a bond as the price that respondents must pay for the right to continue acts that may constitute a section 337 violation. The Commission goes on to argue that Biocraft is confusing the effect of the bonding requirement, benefiting Bristol, with its purpose, increasing importation costs to Biocraft. Additionally, the U.S. Treasury, not the complainant, benefits from any funds forfeited. Finally, the Commission argues that this court in *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1488, 1 USPQ2d 1241, 1252 (Fed.Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987), and in *Rosemount, Inc. v. United States Int'l Trade Comm'n*, 910 F.2d 819, 822, 15 USPQ2d 1569, 1572 (Fed.Cir.1990), emphasized the public interest in temporary relief in section 337 proceedings.

While the Commission correctly states that the settlement agreement did occur after Biocraft's cefadroxil sales, we dis-

agree that these sales were not authorized under Paragraph IV of the Order. Paragraph IV states that specific conduct otherwise prohibited by the Order shall be permitted if it "is licensed or authorized." This language does not exclude any retroactive approval by Bristol.

At oral argument, counsel for Biocraft stated without contradiction that Biocraft informed Bristol of all its sales prior to settlement and that the $21,000,000 payment to Bristol reflected these sales. Paragraph 12 of the settlement agreement stated what the payment included:

> In full satisfaction of Bristol–Myers' claims against Biocraft (and against all those in the chain of distribution to the extent of sales of cefadroxil initially placed in the chain of distribution by Biocraft, and against Biocraft's suppliers to the extent of Biocraft's purchases of cefadroxil) for infringement of the '657 Patent, including Bristol–Myers' claims for increased damages, attorneys fees and costs, Biocraft agrees to pay Bristol–Myers the total sum of twenty-one million dollars ($21,000,000), such payment to be made by check payable to Bristol–Myers Squibb Company...

Additionally, Paragraph 18 of the settlement agreement required Biocraft to try to reclaim the majority of the infringing cefadroxil sold to its distributors.

It is thus clear that the settlement agreement did contemplate the sales made by Biocraft during the effective period of the Temporary Cease and Desist Order and the return of the posted bonds. There is no language in the agreement to the contrary. More importantly, it hardly makes sense for Biocraft to agree to pay $21,000,000 "in full satisfaction" of Bristol's claims and for Bristol to agree to join a petition to the Commission to return Biocraft's bonds, and then for the Commission to conclude that the prior sale of remaining material that Bristol knew Biocraft had sold was not authorized.

Settlement of conflicts is in the public interest and should be encouraged. Where, as here, the complainant, whose

competitive position was being protected by the bonds, agreed to their return as part of a settlement agreement, return of the bonds is consistent with the intent of the parties, thereby encouraging settlement. An opposite result would tend to discourage settlement.

The settlement agreement alone, however, is not controlling in this case. The provisions of the bonds are controlling, and we conclude that they compel release of Biocraft's bonds. Once the sales in question were authorized, they became exempt from the bonds; they were no longer a justification for the Commission to attempt to enforce the bonds.

We also do not find the Commission's public interest arguments to be reason not to release the bonds. We agree that the public interest is involved in the vindication of a patentee's rights under the Trade Act. The provisions of section 337 and its legislative history, in fact, support this conclusion. According to section 337, public interest factors must be considered before the Commission imposes a cease and desist order.[6] However, the Commission did exactly that when it issued the Order. The Order in fact stated, "The Commission has determined that the public interest factors enumerated in 19 U.S.C. § 1337(e) and (f) do not preclude the issuance of temporary relief."

For insight into the purpose of the bonds, we look to the Commission's Order of January 10, 1990, at the time the bonding requirement was ordered. The Commission specifically stated that

> the record indicates that their [respondents'] importation of cefadroxil provides them with a competitive advantage, *viz.*, respondents are able to offer cefadroxil at a lower price because they, unlike Bristol–Myers, have not incurred research and development costs. Accord-

ingly, imposition of some bond on respondents is appropriate.

> We have concluded that the bond should be computed on the basis of the difference between respondents' and Bristol–Myers's prices for cefadroxil monohydrate.

(Footnotes omitted). As for legislative history, the Senate report on the Trade Act of 1974 stated,

> In determining the amount of the bond, the Commission shall determine, to the extent possible, the amount which would offset any competitive advantage resulting from the unfair method of competition or unfair act enjoyed by persons benefiting from the importation of the article.

S.Rep. No. 1298, 93d Cong., 2d Sess. 198 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7331.

Thus, in this case, the public interest coincided with Bristol's interest. Bristol had made substantial investment in cefadroxil before receiving approval from the Food and Drug Administration (FDA) to market the product in the United States. Biocraft, on the other hand, did not have these costs. The purpose of the bonds was to neutralize this difference. Since Bristol agreed to the return of the bonds, the public interest as well as Bristol's interest has been satisfied.

We additionally note that the ultimate destination of bond funds is irrelevant; it is the purpose and the provisions of the bonds that are relevant. Furthermore, the public interest in releasing Biocraft's bonds is in no way inconsistent with our decisions in *Akzo* and *Rosemount*.

■ Thus, we hold that where a complainant agrees as part of a settlement agreement to the return of a bond, the bond itself purports not to apply to sales authorized by the complainant, and the purpose of the bond is to protect the complain-

---

6. [T]he Commission may issue and cause to be served on any person violating this section, or believed to be violating this section, as the case may be, an order directing such person to cease and desist from engaging in the unfair methods or acts involved, *unless after considering the effect of such order upon the*

*public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such order should not be issued.*

19 U.S.C. § 1337(f)(1) (emphasis added).

ant as well as the public interest, the Commission abuses its discretion by declining to release the bond merely because of sales by a respondent of goods known to the complainant at the time of the agreement.

Biocraft also makes other arguments which we need not address.

## CONCLUSION

The Commission's denials of Biocraft's requests for return or cancellation of bonds posted pursuant to the Temporary Cease and Desist Order issued January 10, 1990, were an abuse of discretion. Its order is therefore

REVERSED.